UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

OSHKOSH DEFENSE, LLC,

Plaintiff,

v. Case No. 1:26-cv-1952

UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, LOCAL UNION 578,

Defendant.

---

# COMPLAINT

---

**NOW COMES** Plaintiff, Oshkosh Defense, LLC ("Oshkosh" or "Company"), by and through its attorneys, Quarles & Brady LLP, with its Complaint against Defendant, United Automobile, Aerospace and Agricultural Implement Workers of America, Local Union 578 ("Union") to vacate a labor arbitration award ("Award"), and states as follows:

## INTRODUCTION

1. This action seeks to vacate the Award of Arbitrator Joseph Moriarty ("Arbitrator"), which rewrote rather than enforced the parties' collective bargaining agreement ("CBA" or the "Contract"), and ignored rather than recognized the parties' consistent past practice and acknowledgments in implementing it.

2. For all relevant times, Oshkosh and the Union have agreed, in writing and in practice, that post-sale aftermarket work is not bargaining unit work and that Oshkosh may assign it to be performed in Winnebago County to employees outside the bargaining unit. To that end, in the decade before this dispute, the Union signed five separate Memoranda of Understanding agreeing to exactly that, and at the arbitration its own leadership confirmed that understanding

under oath. As provided under these agreements, in January of 2026, Oshkosh ended a lease at a facility in Winnebago County and moved that same work, performed by the same non-bargaining unit employees, to another Winnebago facility it owns.

3. In response to the Union's grievance challenging Oshkosh's movement of the post-sale aftermarket work, the Arbitrator disregarded the plain language of the CBA and invented a "union shop" limitation found nowhere in the parties' agreements. He then compounded that reversible error by issuing a windfall remedy that neither follows his unjustified finding that Oshkosh breached the CBA, nor is authorized under its arbitration provisions.

4. The parties bargained for an arbitrator who would interpret and enforce their CBA, not one who would substitute his own sense of industrial fairness. Because the Award appealed here ignores the clear language of the CBA, adds terms the parties never agreed to, and imposes a windfall remedy, Oshkosh respectfully requests that this Court vacate it in its entirety pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) and the Federal Arbitration Act, 9 U.S.C. § 10.

## PARTIES

5. Oshkosh is a Wisconsin limited liability company with its principal place of business located at 2307 Oregon Street, Oshkosh, Wisconsin 54902.

6. Oshkosh is a subsidiary of Oshkosh Corporation, a publicly traded company.

7. Oshkosh develops, manufactures, sells, outfits, and services specialty vehicles, including commercial trucks and tactical vehicles for military use.

8. Oshkosh is an employer engaged in an industry affecting commerce within the meaning of Section 2(2) of the National Labor Relations Act, 29 U.S.C. § 152(2), and Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

9. The Union is a labor organization within the meaning of 29 U.S.C. § 152(5) with its principal office located at 2920 Oregon Street, Oshkosh, Wisconsin 54902.

10. The Union is the exclusive bargaining representative for all of Oshkosh's production and maintenance employees located in Winnebago County, Wisconsin, except for office employees, supervisors, coordinators, and plant managers.

## VENUE AND JURISDICTION

11. This Court has subject matter jurisdiction over this action pursuant to Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), and 28 U.S.C. § 1331, because this action seeks to vacate an arbitration award issued under a collective bargaining agreement between an employer and a labor organization representing employees in an industry affecting commerce.

12. This Court has jurisdiction over the Union pursuant to 29 U.S.C. § 185(c) of the Labor Management Relations Act because this is the district in which the Union maintains its principal office, and its duly authorized officers or agents are engaged in representing or acting for employee members.

13. The Eastern District of Wisconsin is a proper federal venue for this action, pursuant to 28 U.S.C. § 1391(b), because it is the judicial district in which (1) the Union resides, and (2) a substantial part of the events and omissions giving rise to Oshkosh's claims occurred.

## FACTUAL BACKGROUND

14. Oshkosh and the Union are parties to a collective bargaining agreement effective from October 1, 2021 through September 30, 2027. A true and correct copy of the CBA is attached as Exhibit 1.

15. Article 1 of the CBA, the recognition clause, defines the bargaining unit and

provides:

> The Company recognizes the Union as the exclusive bargaining agency for all of its production and maintenance employees located in Winnebago County, Wisconsin, except for the following: Office employees, supervisors, coordinators, and plant managers.

(Ex. 1, Art. 1).

16. Article 1 identifies the category of employees the Union represents. It does not state that "production employees" are those who work on already manufactured and already sold Oshkosh trucks, or that all work performed in Winnebago County facilities is Union work. The CBA also does not grant the Union any possessory or exclusionary interest in any Oshkosh facility or the work performed in them.

17. Article 22 of the CBA, the management rights clause, provides in relevant part:

> Section 1: It is agreed that the management of the Employer and its business and the direction of its working forces is vested exclusively in the Employer and that this includes but is not limited to the following: . . . to determine the amount and quality of the work needed, by whom it shall be performed and the location where such work shall be performed; to determine to what extent any process, service or activities of any nature whatsoever shall be added modified, eliminated or obtained by contract with any other person or employer; to introduce new or improved methods, tools, equipment or facilities, or to change existing service practices, methods, tools, equipment and facilities; to schedule the hours of work and to determine the assignment and allocation of duties; to select and to determine the number and types of employees required; to assign work to such employees in accordance with the requirements determined by the Employer . . . .

(Ex. 1, Art. 22, § 1).

18. Article 22, Section 2 of the CBA provides that "[t]he Employer's exercise of the foregoing functions shall be limited only by the express provisions of this Agreement and the Employer has all rights which it had at common law except those expressly bargained away in the Agreement." (Ex. 1, Art. 22, § 2).

19. Article 5, Step D, regarding the grievance arbitration provisions within the CBA,

provides, in relevant part, that "[t]he Arbitrator shall have the authority to interpret and apply this Agreement to the extent necessary to adjudicate the grievance but shall not have the authority to add, to deduct from, or alter the provisions of this Agreement." (Ex. 1, Art. 5, Step D.)

**OSHKOSH'S HARRISON STREET AND JLTV PRODUCTION**

20. To meet its various production, sale, outfitting and service needs, Oshkosh operates multiple plants in Winnebago County, including its Harrison Street facility ("Harrison Street").

21. Oshkosh's Harrison Street facility consists of multiple buildings, including a main building known as "Building 1," and an adjacent building known as "Building 2."

22. Building 1 has historically served as Oshkosh's primary production facility and was the main site for Phase One of the Joint Light Tactical Vehicle ("JLTV") program, a multi-year military contract under which Union members assembled tactical vehicles for the armed forces.

23. At its peak, between 700 and 800 bargaining unit members worked on JLTV presale production work at Harrison Street.

24. Building 2 has traditionally been used for material work, storage, reproduction work, and vehicle repairs.

25. The Union bargaining unit is organized into four job classification levels responsible for pre-sale production and maintenance work. Production work involves the manufacturing and assembly of a truck before it is sold to a customer, and maintenance work involves the service and repair of the production line and tools required to manufacture and assemble a truck.

26. Non-bargaining unit employees have always been present in Oshkosh facilities throughout Winnebago County, including at Harrison Street, working alongside bargaining unit employees.

27. Oshkosh regularly employs non-bargaining unit personnel at Harrison Street, including quality engineers, industrial engineers, materials analysts, operations supervisors, safety coordinators, human resources business partners, training leaders, managers, and directors, who regularly interact with bargaining unit employees on the shop floor.

28. Oshkosh also regularly contracts with outside service providers and contractors to perform work at Harrison Street, including restroom cleaning, paint work, window cleaning, and warranty diagnostics on components such as transmissions and engines.

29. In January 2021, Harrison Street had 235 non-bargaining unit workers assigned alongside the bargaining unit workforce. Even at the peak of JLTV production in January 2022, when 749 Union bargaining unit employees worked at Harrison Street, 234 non-bargaining unit workers were also present at the facility.

30. In February 2023, Oshkosh learned that the Department of Defense would not award it the JLTV II contract, which was a significant blow to Oshkosh's business and anticipated production volume.

31. Following the loss of the JLTV II contract, Harrison Street was left near dormant, and the bargaining unit workforce at that location declined from 749 members at its height, to 379 by January of 2025, and to 77 by March of 2026.

32. Harrison Street currently assembles a lower-volume vehicle known as the Family of Carriers, which requires a substantially smaller production line than the JLTV program required.

**OSHKOSH'S OAKWOOD FACILITY**

33. Oshkosh also previously utilized its Oakwood facility (Oakwood"), which was a leased property also located in Winnebago County.

34. At one time, bargaining unit members performed presale production work at

Oakwood.

35. Oshkosh later transitioned Oakwood to become the primary site for its aftermarket operations, meaning post-sale, nonproduction work on vehicles that had already been manufactured and sold, and that are owned by Oshkosh's customers.

36. Post-sale aftermarket nonproduction work is performed by non-bargaining unit personnel on trucks already manufactured and already sold to Oshkosh customers, and encompasses four primary categories: warranty work, kit installation, refurbishment of battle-weary vehicles, and validation and verification of technical and service manuals.

37. The non-bargaining unit personnel who perform the aftermarket work include both Oshkosh non-bargaining unit employees and outside contractors.

38. Oshkosh has assigned non-bargaining unit personnel to perform aftermarket work because it is extremely variable, usually must be done on a short time frame, can be highly specialized, and requires the individuals performing it to perform a variety of functions, including installation, wrench turning, engineering, and manual drafting.

## THE PARTIES' MUTUAL UNDERSTANDING THAT POST-SALE AFTERMARKET NONPRODUCTION WORK FALLS OUTSIDE THE CBA

39. For nearly a decade, the parties have maintained a consistent practice regarding post-sale aftermarket work: all post-sale aftermarket work is performed by non-bargaining unit personnel unless the parties enter into a Memorandum of Understanding ("MOU") for bargaining unit employees to perform a specifically designated portion of the work for a limited period of time.

40. Between October 2017 and March 2025, Oshkosh and the Union entered into five written MOUs, each addressing a discrete, time-limited occasion on which Oshkosh chose to assign post-sale aftermarket work to bargaining unit members.

41. The five MOUs addressed: (a) retrofit work in October 2017, (b) the exercising of trucks and trailers in July 2019, (c) a JLTV retrofit project in September 2019, (d) FMTV A2 retrofit work in November 2022, and (e) limited warranty work in March 2025, which Oshkosh offered to bargaining unit employees rather than lay them off following an executive order that halted foreign military-funded vehicle production.

42. Each MOU contained the same four written acknowledgments by the Union: a) that the post-sale work was not customarily performed within the Union's bargaining unit; b) that Oshkosh had no obligation to communicate with the Union about such work; c) that Oshkosh was not required to offer such work to the Union; and d) that Oshkosh could assign such work to individuals outside the bargaining unit.

43. Every time the parties entered into an MOU related to aftermarket work, Union President Robert Lynk ("Lynk") or another Union officer signed the MOU on behalf of the Union.

44. The grievance history under the CBA also confirms that the Union understood that bargaining unit members were not entitled to perform post-sale aftermarket nonproduction work. In 2019, the Union filed Grievance No. 126-0-19 after discovering that an outside contractor was performing work on a JLTV at an Oshkosh facility listed in Article 6. Oshkosh denied the grievance because the work was post-sale aftermarket nonproduction work, and the Union never took the grievance to arbitration.

45. Also in 2019, the Union filed a policy grievance over work performed by an outside contractor on JLTV vehicles at Oshkosh's 20th Street facility. Oshkosh denied the grievance because the work was on sold trucks and fell within the retrofit MOU, and the Union never took the grievance to arbitration.

46. In October 2021, the Union filed Grievance No. 274-0-21, protesting the use of

non-bargaining unit workers at Oakwood. Oshkosh denied that grievance, and the Union never took the grievance to arbitration.

47. Union leadership has also repeatedly orally confirmed to Oshkosh management its understanding that — absent a specific written agreement between the parties — bargaining unit members are not entitled to perform post-sale aftermarket nonproduction work.

48. The parties' bargaining history also reinforces this understanding between the parties. During the parties' 2021 contract negotiations, the Union specifically bargained for, and obtained through a side letter, the right to perform the exercising of all models, a form of post-sale aftermarket work involving the testing and driving of fully assembled and sold vehicles.

49. The Union had to secure this limited right at the bargaining table because post-sale work is not "production or maintenance" work which is included within Article 1 of the CBA.

**OSHKOSH MOVES POST-SALE AFTERMARKET NONPRODUCTION WORK TO HARRISON STREET AFTER ENDING ITS OAKWOOD LEASE**

50. In late 2025, Oshkosh decided not to renew its lease of Oakwood and to relocate the aftermarket work to Harrison Street, which had ample unused space because of the loss of the JLTV II contract.

51. On or about January 5, 2026, Oshkosh began moving the non-bargaining unit aftermarket personnel into Building 1 and Building 2 at Harrison Street.

52. As part of the move, within Building 1 Oshkosh erected temporary fencing, and later more permanent steel-framed walls, to segregate the aftermarket work area from the bargaining unit production space.

53. Within Building 1, Oshkosh also built a new lunchroom, and began constructing a bathroom, for the aftermarket workers.

54. The post-sale aftermarket, nonproduction work which Oshkosh moved to Harrison

Street beginning in January of 2026, is the same type of aftermarket, non-production work that non-bargaining unit personnel previously performed at Oakwood.

55. Oshkosh's move of the aftermarket, nonproduction work from Oakwood to Harrison Street did not displace or otherwise prevent a single bargaining unit employee from performing production or maintenance work.

**THE UNION'S GRIEVANCE AND THE ARBITRATION**

56. In January 2026, the Union filed a grievance challenging Oshkosh's use of non-bargaining unit personnel to perform what the Union asserted was bargaining unit work at Harrison Street (the "Grievance").

57. The Grievance alleged violations of Article 1, Article 6, and "all others that apply" related to Oshkosh's decision to move its post-sale aftermarket nonproduction work from Oakwood to Harrison Street.

58. The parties were unable to resolve the grievance, and as a result it was brought to hearing before the Arbitrator on April 16, 2026.

59. In the arbitration, the Union argued that Article 1 of the CBA gives the Union the exclusive right to represent employees performing production and maintenance work and makes no distinction between pre-sale and post-sale work.

60. Oshkosh argued that Article 22, the management rights clause of the CBA, is dispositive because it expressly grants Oshkosh the exclusive right "to determine the amount and quality of the work needed, by whom it shall be performed and the location where such work shall be performed."

61. Oshkosh further argued that Article 1 grants the Union jurisdiction over employees, not work, and that the parties' longstanding past practice and agreements, as memorialized in the

MOUs and Union officers' statements to Oshkosh, confirm that post-sale, aftermarket work is not bargaining unit work.

## THE ARBITRATOR'S AWARD

62. On July 24, 2026, the Arbitrator issued the Award. A true and correct copy of the Award is attached as Exhibit 2.

63. The Arbitrator adopted neither party's statement of the issue. Instead, stating that he was "left to discern what the issue is," the Arbitrator framed the issue himself as "[w]hether the Employer violated Article 1 - Recognition when it moved a non-bargaining unit workforce into the Harrison Street facility to perform aftermarket work." Ex. 2, p. 13.

64. The Arbitrator also stated that, although it was the Union's burden to prove a contract violation, there was "little evidence about what the non-union workforce is actually doing at the Harrison Street facility." Ex. 2, p. 14.

65. Despite this lack of evidence, the Arbitrator concluded that Article 1 "clearly and unambiguously includes all employees doing production and maintenance work, even those employees doing that work post-sale or aftermarket," and characterized the distinction between manufacturing and aftermarket work as "an accountant's distinction." Ex. 2, p. 16.

66. Despite conceding that Oshkosh's use of non-bargaining unit personnel to perform post-sale work is "a longstanding practice" in which the Union "has at least acquiesced," the Arbitrator nonetheless declined to give either meaning or effect to that practice, or the Union's repeated and consistent written and oral acknowledgements – including through five separate written MOUs entered in the decade before the arbitration, including as late as 2025. Instead, the Arbitrator found these that the long standing agreements and practices lacked "mutual understanding." Ex. 2, p. 16.

67. The Arbitrator rejected Oshkosh's reliance on Article 22, stating that "[w]hat is happening is enforcement of the recognition agreement in the CBA," and held that the Union "did bargain for and win recognition of all work, including aftermarket work" in Article 1. Ex. 2, p. 18.

68. After sustaining the grievance, the Arbitrator ordered the following remedy:

a. Within 45 calendar days, Oshkosh must cease having its non-union workforce perform production and maintenance work, "which includes any post-sale or aftermarket work," at Harrison Street's Building 1;

b. Oshkosh must identify bargaining unit members who were on layoff status as of January 5, 2026 and who were qualified to perform the aftermarket work, and recall them from layoff or rescind their layoff retroactive to January 5, 2026;

c. Oshkosh must pay those employees retroactive pay and benefits and make them whole for any other foreseeable losses directly attributable to Oshkosh's actions;

d. Oshkosh must regularly communicate with the Union on its progress in implementing the Award.

**THE AWARD IS CONTRARY TO THE CBA, THE PARTIES' PAST PRACTICE AND AGREEMENTS, AND THE UNION'S REPEATED ACKNOWLEDGMENTS CONCERNING AFTERMARKET WORK**

69. The Arbitrator's Award disregards the written commitments the Union signed, ignores the sworn and unsworn oral admissions of the Union's own leadership, and rewrites the CBA to give the Union work it never bargained for and repeatedly disclaimed.

70. As the grieving party in a contract interpretation dispute, the Union bore the burden of proving by a preponderance of the evidence that the aftermarket work performed in Building 1 is covered by Article 1. The Union did not meet that burden. Neither the Arbitrator nor the Union's witnesses even knew what aftermarket work was actually being performed in Building 1, beyond the fact that it involved similar tools.

71. Rather than hold the Union to its burden, the Arbitrator expressly stated that he was

"assuming for purposes of this award that the non-union workforce is doing only aftermarket or post-sale work at Building 1." His conclusion that this work constitutes production and maintenance work was therefore based on speculation, not evidence.

72. The Arbitrator also found that the parties lacked a "mutual understanding" regarding the scope of their practice regarding aftermarket work. That finding is contrary to the undisputed written MOUs, the undisputed oral admissions of a Union official, made to Oshkosh management at various times, the Union's own grievances which it never took to arbitration, and to the undisputed testimony of the Union's own witnesses.

73. The five separate MOUs, each signed by the Union, specifically acknowledge that aftermarket work is not bargaining unit work, and that Oshkosh may assign that work in its discretion, including to individuals outside the bargaining unit. None of the MOUs limited that acknowledgment to facilities where bargaining unit employees are not working.

74. Lynk admitted at the arbitration hearing that aftermarket work performed outside Harrison Street "is not our work," and Union Business Agent Joe Preisler ("Preisler") likewise admitted that, in every relevant MOU, the Union agreed that aftermarket work was not bargaining unit work.

75. It is also undisputed that the aftermarket work performed in Building 1 is the same work that was performed at Oakwood, which the Union acknowledges is not bargaining unit work.

76. The Arbitrator nonetheless ignored this evidence and gave effect to a facility-based limitation that the Union asserted for the first time in this Grievance, and which finds no support in the CBA, the parties' past practice, or the parties' MOUs concerning aftermarket non-production work.

77. The Arbitrator further held that the Union "did bargain for and win recognition of

all work, including aftermarket work" in Article 1, which finding contradicts the undisputed evidence, including Lynk's admission that the Union may need to negotiate for the aftermarket work in Building 1 at the next round of bargaining, and Preisler's admission that he told Oshkosh's Human Resources Vice President, Kristin Pick ("Pick") that the Union was willing to negotiate about performing aftermarket work.

78. The Arbitrator's Award also misidentified Preisler, the Union officer whom the Union called as a witness at the hearing, as a witness for Oshkosh.

## THE REMEDY AWARDED CONSTITUTED A WINDFALL WHICH NEITHER FOLLOWS FROM THE ARBITRATOR'S SUSTAINMENT OF THE GRIEVANCE NOR IS ALLOWED UNDER THE CONTRACT

79. In sustaining the grievance, the Arbitrator concluded that the parties' understanding was that aftermarket work could not be performed in an Oshkosh building where bargaining unit members were working. Even accepting that unsupported conclusion, the only logical remedy would be to remove the aftermarket work from Building 1, not to require Oshkosh to recall and pay laid-off bargaining unit members for the aftermarket work that Oshkosh moved from Oakwood to Harrison Street, that was performed by non-bargaining unit personnel, and that the bargaining unit has never performed outside of a specifically agreed upon and carefully limited written MOU.

80. The award of back pay to bargaining unit employees on layoff also disregards the undisputed reason for those layoffs, which resulted from the loss of the JLTV contract and the related business downturn, not from Oshkosh's decision to move aftermarket work from Oakwood to Building 1.

81. The aftermarket work transferred from Oakwood to Building 1 was never performed by bargaining unit members. Bargaining unit employees therefore lost nothing as a result of the relocation of the aftermarket work, and Oshkosh's decision to move it to a separate

area within Harrison Street Building 1 did not displace or otherwise prevent a single bargaining unit employee from performing production or maintenance work at that or any other Oshkosh facility.

82. An award of back pay and benefits to laid-off bargaining unit members bears no relation to the transfer of work from Oakwood to Building 1. Rather than making any employee whole, the remedy creates a back pay and reinstatement windfall for bargaining unit members who would never have performed the aftermarket work which even the Union admits Oshkosh had the right to assign to non-bargaining unit personnel.

**THE ARBITRATOR'S AWARD CONSTITUTES REVERSIBLE ERROR.**

83. The Award's conclusions, including that aftermarket work within Building 1 is included within the Recognition Clause, and the Award's remedy, constitute reversible error. The Award exceeded any authority provided under the CBA, it constituted a manifest disregard for the law, and it violated public policy by refusing to give contractual commitments their effect and providing a windfall remedy.

## CAUSE OF ACTION

### COUNT I: VACATUR OF ARBITRATION AWARD

84. Oshkosh repeats and realleges paragraphs 1 through 83 as if set forth fully herein.

85. The Arbitrator's Award exceeded any authority provided under the CBA, including by (1) ignoring the clear and unambiguous language and understanding of the CBA and the MOUs, (2) adding terms and obligations into the parties' agreements that do not exist in them, and (3) ordering a remedy that has no basis in the CBA, the evidence, or the CBA's grievance and arbitration provisions.

86. Article 22, Section 1 of the CBA vests in Oshkosh the exclusive right "to determine

the amount and quality of the work needed, by whom it shall be performed and the location where such work shall be performed," as well as "to introduce new or improved methods, tools, equipment or facilities, or to change existing service practices, methods, tools, equipment and facilities" in performing work.

87. No express provision of the CBA, and no MOU, prohibits Oshkosh from assigning post-sale aftermarket work to non-bargaining unit employees to its facility at Harrison Street. To the contrary, the MOUs expressly confirm Oshkosh's right to assign that work outside the bargaining unit.

88. The Award acknowledged the Union's burden to prove a contract violation, and acknowledged that there was "little evidence about what the non-union workforce is actually doing at the Harrison Street facility." Nonetheless, the Award assumed without evidence, and contrary to the undisputed testimony Oshkosh provided, that the aftermarket, nonproduction work which Oshkosh transferred from Oakwood to Harrison Street is production and maintenance work covered by Article 1.

89. The Award acknowledged that Oshkosh's use of non-bargaining unit personnel to perform post-sale work is "a longstanding practice" in which the Union "has at least acquiesced," and the MOUs signed by the Union confirm that Oshkosh may assign that work outside the bargaining unit. Nonetheless, the Award found no "mutual understanding" between the parties concerning the performance of aftermarket work.

90. Despite the express language of the CBA granting to Oshkosh the unilateral right "to introduce new facilities" and "to change facilities" in which it performs work, the Award created an unwritten, facility-based limitation regarding where Oshkosh could perform aftermarket work, that appears nowhere in the CBA or the MOUs.

91. Despite undisputed testimony from Union leadership that the Union would need to negotiate for that work, and despite the 2021 side letter to the CBA in which the Union negotiated to secure limited post-sale truck exercising work, the Award held that the Union "did bargain for and win recognition *of all work, including aftermarket work*." (Emphasis added).

92. Despite the undisputed evidence that any layoffs of bargaining unit employees at Harrison Street resulted from the loss of the JLTV contract, and that the bargaining unit employees never performed the aftermarket work transferred from Oakwood, the Award ordered Oshkosh to recall and provide back pay and benefits to laid-off bargaining unit employees at Harrison Street Building 1 who may have been qualified to perform that work. Even under the Arbitrator's flawed reasoning, the only appropriate remedy would have been removal of the work from Building 1.

93. Despite the CBA's express provision prohibiting the Arbitrator from "add[ing] to, deduct[ing] from, or alter[ing] its provisions," the Award's remedy does not make any employee whole, but instead creates a reinstatement and back pay windfall for work bargaining unit members would never have performed — the aftermarket nonproduction work performed by non-bargaining unit personnel that Oshkosh transferred from Oakwood to Harrison Street Building 1.

94. Despite the undisputed fact that Oshkosh owns its Harrison Street Building 1 facility, and the tools and materials within it, the Award effectively confers on the Union an inappropriate ownership right in Harrison Street Building 1.

95. Despite Article 22's express provision reserving to Oshkosh the rights to introduce new facilities, and to change its facilities, the Award gave the Union the right to exclude Oshkosh from using its own facilities to perform non-bargaining unit work with non-bargaining unit employees, effectively requiring the Company to abandon a good portion of its own property.

96. The Award — which failed to draw its essence from the CBA, reflected the

Arbitrator's own notions of industrial justice, and exceeded the Arbitrator's enumerated powers under the CBA — must be vacated in all parts pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and 9 U.S.C. § 10(a).

**WHEREFORE**, Oshkosh respectfully requests that this Court enter judgment as follows:

(1) Vacating the Award in its entirety, and

(2) Awarding such other and further relief as the Court deems just and equitable under the circumstances.

Dated this 20th day of October, 2026.

QUARLES & BRADY LLP

*<u>/s/ Steven M. Kruzel</u>*

ROBERT H. DUFFY (SBN: 1010996)
STEVEN M. KRUZEL (SBN: 1086539)
HARRISON H. RAYMENT (SBN: 1122631)
QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2350
Milwaukee, WI 53202-4426
(414) 277-5000